[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
{¶ 1} Sheila L. Bailey filed this action in mandamus seeking a writ which compels the Industrial Commission of Ohio ("commission"), to grant her temporary total disability ("TTD") compensation from April 19, 2001 through January 28, 2002.
 {¶ 2} In accord with Loc.R. 12(M), the case was referred to a magistrate to conduct appropriate proceedings. The parties stipulated the pertinent evidence and filed briefs. The magistrate then issued a magistrate's decision which includes a recommendation that we deny the requested writ. (Attached as Appendix A.)
 {¶ 3} Counsel for Ms. Bailey has filed objections to the magistrate's decision. Counsel for the commission and counsel for Delphi Packard Electric Systems, Ms. Bailey's employer, have each filed a memorandum in response. The case is now before the court for a full, independent review.
 {¶ 4} In April 2001, Ms. Bailey was feeling pain, numbness and tingling in her right hand and arm which she used extensively in her work with Delphi Packard Electric Systems at Warren, Ohio ("Delphi Packard"). Sheila took sick leave, and, at the end of the month, her employer's medical department verified that she had restrictions on the use of her right hand which prevented her from returning to work.
 {¶ 5} On May 1, 2001, Ms. Bailey went to see Lawrence Wells, M.D., who made an initial diagnosis of "overuse injury, right hand and forearm, with early carpal tunnel syndrome." When her symptoms persisted, he referred her for an EMG nerve conduction study.
 {¶ 6} The doctor who performed the EMG reported lateral epicondylitis of the right elbow, right tenosynovitis with neurogenic compression and probable right thoracic outlet syndrome. Dr. Wells was not comfortable with making a three-fold diagnosis. As a result, he modified his initial diagnosis to "lateral epicondylitis and tenosynovitis." He referred her to a vascular specialist to evaluate or rule out thoracic outlet syndrome, which is a vascular condition.
 {¶ 7} In September 2001, Dr. Wells referred Ms. Bailey for an MRI, to rule out musculoskeletal problems of the neck and/or shoulder. As Dr. Wells anticipated, the MRI came back normal.
 {¶ 8} By October of 2001, Dr. Wells concluded that he had no additional treatment to offer. Ms. Bailey still showed symptoms of tenosynovitis and mild lateral epicondylitis. His ongoing recommendation was for Ms. Bailey to avoid activities which increased her pain and numbness, which presumably included her form of work at Delphi Packard.
 {¶ 9} In November 2001, a staff hearing officer ("SHO"), allowed Ms. Bailey's claim for the conditions "right lateral epicondylitis, tenosynovitis right wrist."
 {¶ 10} In January 2002, Ms. Bailey began treatment with Robert F.Naples, D.O. Dr. Naples certified TTD compensation beginning January 28, 2002. Delphi Packard, which is a self-insured employer, then began paying TTD. Next, Ms. Bailey applied for TTD from the date she stopped working in April until the date Delphi Packard began paying TTD following the report of Dr. Naples.
 {¶ 11} A district hearing officer ("DHO") denied the TTD compensation for periods of time which preceded January 28, 2002, because no medical evidence from a doctor who had seen Ms. Bailey, including Dr. Wells, had attributed her time off work solely to her allowed conditions.
 {¶ 12} On May 2002, Ms. Bailey was still seeking treatment for her medical problems related to a potential thoracic outlet syndrome. However, a final diagnosis was awaiting the results of a venogram.
 {¶ 13} A hearing before an SHO was held, and TTD for a period before January 28, 2002, was again denied due to the ongoing lack of clarity about whether conditions other than lateral epicondylitis and tenosynovitis were the actual cause of Ms. Bailey's inability to work.
 {¶ 14} On May 23, 2002, Dr. Wells certified TTD from May 1, 2001 to March 1, 2002, due to the allowed condition. His C-84 was filed after the hearing before the SHO.
 {¶ 15} The commission did not consider the C-84 and refused further appeal.
 {¶ 16} The orders of the DHO and SHO were reasonable, given the medical information before them. The question becomes whether or not the commission was under an obligation to consider the C-84 of Dr. Wells under the circumstances.
 {¶ 17} The magistrate concluded that the commission was not obligated to consider the C-84 from Dr. Wells based upon her understanding of State ex rel. Domjancic v. Indus. Comm. (1994),69 Ohio St.3d 693 and State ex rel Cordray v. Indus. Comm. (1990),54 Ohio St.3d 99. Counsel for Ms. Bailey argues that Domjancic and Cordray are cases which involve permanent total disability questions and that TTD cases are governed by a different standard. Counsel for the commission disagrees and cites to a case from this court which applied Domjancic and Cordray to a TTD compensation question.
 {¶ 18} Counsel for Delphi Packard cite to Ohio Administrative Code 4121-3-09(C)(5), which reads:
 {¶ 19} "At hearings with notice, consideration shall be confined to the issues presented in the adjudication of the claim and the parties shall be prepared to fully present their respective positions in regard to such issues."
 {¶ 20} We hate to penalize Ms. Bailey for the delay in the C-84 of Dr. Wells being submitted to the commission for consideration, but in light of Ohio Adm. Code 4121-3-09(C)(5), in particular, we have no choice. The commission can only make decisions based upon the information before it, not based upon reports which could or should have been generated and provided.
 {¶ 21} We overrule the objections to the magistrate's decision. We adopt the findings of fact and conclusions of law contained in the magistrate's decision. As a result, we deny the request for a writ of mandamus.
Objections overruled, and writ of mandamus denied.
BRYANT and KLATT, JJ., concur.
 DECISION IN MANDAMUS {¶ 22} In this original action in mandamus, relator, Sheila L. Bailey, asks the court to issue a writ compelling respondent Industrial Commission of Ohio ("commission") to vacate its order denying a closed period of compensation for temporary total disability ("TTD"), from April 19, 2001 through January 28, 2002, and to issue an order granting the requested compensation.
Findings of Fact:
 {¶ 23} On April 19, 2001, Sheila L. Bailey ("claimant") was experiencing symptoms of pain, numbness and tingling of her right upper extremity, and she took sick leave from her job, which required repetitive use of her right hand.
 {¶ 24} On April 30, 2001, claimant was examined by the employer's medical department, which determined that claimant had restrictions of the right hand that prevented her from performing her job. Claimant was authorized to remain on sick leave because no restricted work was available.
 {¶ 25} On May 1, 2001, claimant visited Lawrence Wells, M.D., an orthopedic specialist, who concluded as follows: "Overuse injury, right hand and forearm, with early carpal tunnel syndrome." He concluded that claimant should remain off work, use a splint and medication, and have an EMG nerve conduction study if symptoms persisted.
 {¶ 26} On May 15, 2001, claimant visited Dr. Wells, who noted that claimant was being treated for "early carpal tunnel syndrome" and a right forearm strain or overuse injury. Claimant reported persistent symptoms of the right upper extremity, and Dr. Wells' assessment was: "Carpal tunnel syndrome that is not resolving at this point in time. Her hand is increasingly more clumsy despite a 2 to 3-week convalescence." Dr. Wells ordered an EMG and instructed claimant to remain off work.
 {¶ 27} On May 22, 2001, the employer's medical department completed a form stating that claimant had restrictions and was authorized to remain on sick leave because no restricted work was available. The employer continued to file such reports.
 {¶ 28} On June 26, 2001, claimant visited Dr. Wells, at which time he had the results of the EMG, which showed lateral epicondylitis of the right elbow without radial involvement, right tenosynovitis without neurogenic compression, and probable right thoracic outlet syndrome (a vascular condition). Dr. Wells stated:
 {¶ 29} "Her EMG nerve conduction study suggests 3 different diagnoses which is a little bit beyond what I am usually most comfortable with making at any one time. However, she is tender over the lateral epicondyle of her right elbow and mildly tender over her wrist suggestive of some mild first dorsal compartment discomfort as well as lateral epicondylitis."
 {¶ 30} Dr. Wells recommended consultation with a vascular specialist regarding the right thoracic outlet. For the other conditions, he prescribed medication, an elbow strap, and light duty work.
 {¶ 31} 7. On July 25, 2001, Dr. Wells reported that claimant "returns for reevaluation for lateral epicondylitis, questionable De Quervain's tenosynovitis and thoracic outlet syndrome." Claimant had not yet seen a specialist for the vascular condition, thoracic outlet syndrome. Her elbow was less tender, and Dr. Wells stated that she should continue with physical therapy. His assessment was: "Resolving lateral epicondylitis, right elbow."
 {¶ 32} In September 2001, Dr. Wells examined claimant, stating that she was being followed for lateral epicondylitis of the right elbow but was also complaining of increasing pain of the right chest wall, neck, right shoulder, and upper arm. Dr. Wells reiterated that the EMG suggested thoracic outlet syndrome, lateral epicondylitis and De Quervains tenosynovitis. He recommended an MRI to rule out musculoskeletal problems of the neck/shoulder but stated that he anticipated the MRI would be normal.
 {¶ 33} In October 2001, Dr. Wells examined claimant and reported the MRI results, which were normal. He noted symptoms of tenosynovitis and mild lateral epicondylitis. However, he concluded that he had no further treatment to offer and recommended only that claimant refrain from engaging in activities that increased her symptoms.
 {¶ 34} In November 2001, a staff hearing officer ("SHO") allowed the claim for "right lateral epicondylitis tenosynovitis right wrist."
 {¶ 35} On January 28, 2002, claimant began treatment with Robert F. Naples, D.O., who certified TTD to March 1, 2002, based on "727.05 Right wrist tendonitis" and "726.32 Right lateral epicondylitis."
 {¶ 36} The self-insured employer paid TTD compensation beginning January 29, 2002, based on Dr. Naples' report.
 {¶ 37} In February 2002, claimant filed a request for TTD for the closed period from April 19, 2001 through January 28, 2002.
 {¶ 38} In April 2002, a district hearing officer ("DHO") denied the motion on grounds that claimant had failed to establish by a preponderance of the evidence that the allowed conditions independently rendered her temporarily and totally disabled as alleged. The DHO explained:
 {¶ 39} "In making this decision, the Hearing Officer has relied upon the fact that claimant has failed to offer any medical evidence of temporary total disability from a physician that saw claimant during this period, that specifically states that claimant was temporarily and totally disabled due solely to the allowed conditions herein or an opinion of temporary total disability from a physician who has reviewed all of the records from examining physicians during this period, and accepted their findings."
 {¶ 40} On May 9, 2002, claimant was examined by Gordon Zellers, M.D., who concluded among other things that claimant could was unable to return to work due to problems with her right upper extremity, but he did not causally connect this inability to the allowed conditions in and of themselves, independent of other conditions. He noted that a vascular surgeon, Susan Begalman, reported preliminary studies supporting thoracic outlet syndrome but that a venogram was needed to make that diagnosis.
 {¶ 41} On May 13, 2002, an SHO ruled as follows:
 {¶ 42} "The order of the District Hearing Officer, from the hearing dated 04/04/2002, is modified to the following extent. Therefore, the C-86 motion, filed 2/25/02, is denied.
 {¶ 43} "The Staff Hearing Officer denies the claimant's request for temporary total compensation for the closed period from 4/19/01 through 1/28/02 inclusive. The Staff Hearing Officer finds that there is insufficient medical evidence to establish that the allowed disorder in this claim independently resulted in the claimant being temporarily and totally disabled during the above time frame. (Claimant is not requesting temporary total compensation beyond 1/28/02 at this time as the self-insured employer has previously paid temporary total compensation from 1/29/02). The Staff Hearing Officer finds that the office notes and 5/1/01 FROI-1 report of Dr. Wells address claimant's extent of disability in the context of allowed and non-allowed disorders. Specifically, the above documentation describes the presence of `carpal tunnel syndrome' — a condition not presently allowed in this claim. The 5/1/01 narrative report of Dr. Wells similarly addressed the claimant's symptoms in the context of carpal tunnel syndrome.
 {¶ 44} "Given the above documentation, the Staff Hearing Officer is not persuaded that claimant has established her burden of proof of showing that the allowed disorders in this claim independently resulted in her being temporarily and totally disabled in the above time period. All evidence was reviewed and considered."
 {¶ 45} On May 23, 2002, Dr. Wells filed a C-84 form certifying TTD from May 1, 2001 (the date of first examination) to March 1, 2002, based on "727.05 Rt. Wrist Tendonitis [and] 726.32 Rt. Lateral Epicondylitis."
 {¶ 46} (Note: The table of contents for the stipulated record, prepared and filed by claimant's counsel, states that this C-84 was filed on May 23, 2002. The date stamp is not legible, however, on the copy of the document itself.)
 {¶ 47} The commission refused further appeal.
Conclusions of Law:
 {¶ 48} Claimant challenges the commission's denial of TTD from April 19, 2001 through January 28, 2002. The issue before the court is whether the commission cited "some evidence" to support its decision and provided an adequate explanation of its reasoning. State ex rel. Mitchell v. Robbins Myers, Inc. (1983), 6 Ohio St.3d 481; State ex rel. Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203.
 {¶ 49} In the present action, claimant's treating physician initially diagnosed carpal tunnel syndrome, but when the EMG provided further information, he changed his diagnosis to epicondylitis, tenosynovitis, and a vascular condition, right thoracic outlet syndrome. The first two conditions were allowed in the claim but the third condition was not. Therefore, in order for claimant to be awarded TTD, it was incumbent on her to submit a medical report stating that one or both of the allowed conditions prevented her from performing her usual duties. Specifically, she needed to present a medical opinion that the epicondylitis and/or the tenosynovitis caused her to be unable to perform her job, regardless of the thoracic outlet syndrome. State ex rel. Bradley v. Indus. Comm. (1997), 77 Ohio St.3d 239, 242; State ex rel. Stone Container Corp. v. Indus. Comm. (1997), 79 Ohio St.3d 163.
 {¶ 50} Here, the employer promptly paid TTD when it received a medical opinion from Dr. Naples stating that claimant was unable to return to work due to epicondylitis and tendonitis. (The employer accepted "tendonitis" as a sufficient identification of "tenosynovitis," which was within its discretion.) However, none of Dr. Wells' reports ever stated the simple conclusion that epicondylitis and the tendonitis/tenosynovitis prevented claimant from returning to work. Dr. Wells did not submit a C-84 basing TTD on those two conditions until after the evidentiary hearings were completed, at which point the commission had no duty to consider it. State ex rel. Domjancic v. Indus. Comm. (1994), 69 Ohio St.3d 693; State ex rel. Cordray v. Indus. Comm. (1990), 54 Ohio St.3d 99.
 {¶ 51} Dr. Wells' reports that were before the hearing officers may reasonably be viewed as failing to make the requisite causal connection. His early reports show an initial impression of carpal tunnel syndrome with overuse injury, although he discarded the carpal tunnel theory upon receipt of the EMG results. However, in the report of June 2001 — in which he first diagnosed the allowed conditions — he also relied on a non-allowed condition of the circulatory system that could reasonably account for some of claimant's complaints. None of his reports in the file made the simple statement that, from April 2001 through January 2002, claimant could not return to work due to the allowed conditions.
 {¶ 52} The first and only report in which Dr. Wells unambiguously stated the requisite causal connection (echoing the C-84 of Dr. Naples) was his C-84 report filed May 23, 2002. However, this crucial evidence was filed after the second evidentiary hearing. Accordingly, the commission was not required to consider it. Domjancic; Cordray.
 {¶ 53} There is nothing wrong with a physician updating and refining his initial diagnosis following the results of diagnostic testing. Indeed, such adjustment upon test results is perfectly reasonable. However, at some point, if a claimant wants TTD based solely on the allowed conditions, she must provide a medical opinion of TTD caused solely by the allowed conditions. Here, claimant's counsel sets forth no reason that such an opinion from Dr. Wells could not have been filed at or before the SHO hearing. When claimant filed such an opinion from Dr. Naples, TTD was paid. For reasons not indicated in the record, claimant's counsel did not file a similar C-84 from Dr. Wells after the evidentiary hearings had closed.
 {¶ 54} Accordingly, based on the evidence that was before the commission when it made its decision, the magistrate concludes that the commission did not abuse its discretion in denying TTD for the period prior to January 29, 2002. The magistrate therefore concludes that the court should deny the requested writ of mandamus.